# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00331 (CKK)** |
| **v.** | : | |
| | : | |
| **KENNETH KELLY,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth Kelly ("Kelly") to a two-month term of home detention as part of a 36-month term of probation, and 60 hours of community service. The defendant has already satisfied his $500 restitution obligation. *See* ECF No. 31 (Presentence Investigation Report ("PSR")), ¶ 9 n.4.

## I.      Introduction

The defendant, Kenneth Kelly, an emergency room doctor, and his close friend Leonard Gruppo ("Gruppo") (Case No. 1:21-cr-391 (BAH)),[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

---

[1] On October 29, 2021, Chief Judge Howell sentenced Gruppo to 90 days' home detention as part of a 24-month probation sentence. Gruppo was further ordered to pay a $10 special assessment, $500 in restitution, and a $3,000 fine. *See United States v. Leonard Gruppo*, 1:21-cr-391 (BAH), ECF No. 32.

Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

On September 17, 2021, Kelly pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a two-month term of home detention as part of a 36-month sentence of probation is appropriate in this case because in the hours after the attack on the Capitol, the defendant sent boastful texts to family members expressing his pride about having participated in the riot.  Specifically, the defendant bragged about how he and other rioters entered the Capitol[2] "via breaking in windows" while the Senate was in session debating Arizona's electoral vote count on January 6, 2021."  ECF No. 1-1 (Statement of Facts), at 4.  He also bragged about how he caused senators to "hid[e] under ther [*sic*] desks," and "forced [Congress] into recess."  *Id.*  Further, the defendant's description of his conduct as "patriotic" in these text messages—even after he had personally observed violence between law enforcement officers and rioters—not only demonstrates his lack of remorse that day, but also raises concern about the defendant's future participation in similar riotous and anti-democratic conduct.  The defendant's statements after January 6 evince a disrespect for the most fundamental tenets of our democracy, and a disregard for the safety and security of our country's leaders.

In choosing to enter the U.S. Capitol Building, Kelly deliberately ignored several red flags. Kelly entered the U.S. Capitol Grounds from the west front. While he did not recall passing by any steel barricades, he did acknowledge seeing bike racks strewn across the Capitol lawn.  From where he was standing at the base of the northwest staircase, he could see rioters scaling the outer walls of the Capitol Building and climbing across the white scaffolding that had been erected over

---

[2] The defendant's text messages mistakenly identify the building he entered as the White House.

half of the northwest staircase.  As the crowd swelled in size, Kelly chose to partake in, and contribute to, the chaos by climbing over the ledge of the stone staircase and joining the scores of rioters who were packed shoulder-to-shoulder on the staircase. In fact, during a debrief with law enforcement, Kelly acknowledged that he had to be pulled up on to the staircase by other rioters because the ledge was too high to mount on his own.

When the defendant ascended the stairs to the Upper West Terrace, he witnessed law enforcement officers forcibly pushing rioters away from the Capitol Building.  Instead of leaving the premises at that point, Kelly chose to walk toward the Senate Wing door and enter the Capitol Building. During his debrief, Kelly acknowledged seeing broken windows next to the door he entered.  Indeed, in text messages to family, Kelly bragged about how rioters had entered the Capitol Building "via breaking in windows."  Statement of Facts, at 3.  Finally, instead of heeding an officer's advice to exit the Capitol Building through the Senate Wing door behind him, Kelly and Gruppo chose to turn around and continue walking south through the Capitol before exiting a couple minutes later.

This Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, combined with the defendant's celebration and endorsement of the violence on that day, render a term of home confinement appropriate in this case.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 23 (Statement of Offense), ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Kenneth Kelly's Role in the January 6, 2021 Attack on the Capitol*

Kelly drove alone to Washington, D.C. from his home in Florida to attend the "Stop the Steal" rally on January 6, 2021.  Upon arriving in D.C., Kelly met up with his good friend and former colleague, Gruppo, and Gruppo's wife, and attended the rally on January 6.  There, Kelly and Gruppo took a "selfie" together in front of the Washington Monument.  At approximately 11:04 a.m., Kelly texted this selfie of himself and Gruppo to a family member.  Statement of Facts, at 2-3.

Wednesday 11:04 AM

Ken



After former President Trump finished delivering his remarks, Kelly, Gruppo, and Gruppo's wife walked from the Ellipse toward the U.S. Capitol. While Kelly could not recall what time he arrived on the Capitol grounds, Gruppo told investigators that he arrived at the grounds approximately one-and-a-half to two hours before ultimately entering the Capitol building. *See* Case No. 21-cr-391 (BAH), ECF No. 24, at 5. Kelly did not recall walking past any steel barricades when he arrived at the Capitol grounds, but he did recall seeing bike racks across the lawn.

Kelly and Gruppo then stood in the grassy area bordering the northern staircase on the west side of the Capitol Building, as indicated by the red arrow in the aerial image below.



While Kelly claimed during his debrief that he could not see much due to the density of the crowd around him, he acknowledged seeing rioters scaling the stone retaining walls of the Capitol Building and walking atop the white scaffolding that had been erected over half of the staircase.[3]

In addition to what Kelly has admitted to seeing, he also likely would have heard the deafening sounds of flash bangs exploding as nearby rioters at the Lower West Terrace clashed with law enforcement officers for hours. Had he looked up, he likely would have seen rioters being pursued by law enforcement as they climbed the white scaffolding directly above him. And he almost certainly would have heard the crowd chanting slogans like, "Our House," and "Stop the Steal," as surrounding rioters demanded that officers let them inside the building.

---

[3] During his debrief with law enforcement, Gruppo, who was standing with Kelly at the time, admitted to seeing puffs of smoke and to hearing individuals on bullhorns urging the crowd to keep moving forward. *See United States v. Leonard Gruppo*, 1:21-cr-391 (BAH), ECF No. 24, at 6.

Instead of departing the grounds as the scene near the Lower West Terrace grew more chaotic, Kelly de]cided to join the fray by climbing the ledge at the bottom of the northwest staircase. As depicted in the below photograph taken by Kelly, rioters were packed shoulder-to-shoulder on the northwest staircase and were being hoisted up by other rioters, who were standing precariously on the staircase ledge.



Kelly then ascended the stairs to the Upper West Terrace, where he witnessed a large group of law enforcement officers clashing with rioters and forcibly pushing rioters away from the Capitol. Instead of leaving the premises after witnessing this violence, Kelly instead chose to enter the Capitol Building.[4]

---

[4] Entering the Capitol Building was not Kelly's only option at that point. Even if he could not go back down the crowded northwest staircase, Kelly could have exited the grounds by walking north, in the opposite direction from where law enforcement officers had assembled.

Upon approaching the Senate Wing door on the northwest side of the Capitol Building, Kelly could see broken glass. That is because approximately 45 minutes prior, rioters used weapons and stolen riot shields to break open the windows and climb inside the building. Kelly was aware that rioters had broken these windows; indeed, in texts to a family member on January 6, Kelly celebrated the destructive and violent acts of his fellow rioters: "Inside White House [sic] via breaking in windows . . . Tree of liberty was watered today!"




Inside White house via breaking in windows

Tree of liberty was watered today!



As shown by the above photograph and as confirmed by the United States Capitol Police ("USCP") surveillance footage, Kelly was carrying a phone to record and take photographs while inside the Capitol Building. The government has reviewed Kelly's phone pursuant to Kelly's consent, and has not been able to identify any additional footage or photographs captured by Kelly inside the U.S. Capitol Building, even though GPS data indicates that there may have been more photographs and/or videos taken inside or near the Capitol Building.



Immediately upon entering the Capitol Building, Kelly, Gruppo, and Gruppo's wife turned right and walked south down the hallway toward the Crypt.  Approximately two minutes later, the three returned to the Senate Wing entrance so that Gruppo could ask USCP officers how to exit the building.  *See* Case No. 21-cr-391 (BAH), ECF No. 24, at 8-9.  As seen in the surveillance footage, one of the USCP officers repeatedly pointed Gruppo toward the Senate Wing door—the same door through which he and Kelly had entered.  When asked about this interaction during his debrief, Kelly insisted that the USCP officer pointed them down each hall, but did not tell them to exit through the Senate Wing door. The surveillance footage, however, shows that the USCP officer pointed only at the Senate Wing door, and did not point to any other exits.[5]

---

[5] It is possible that Kelly did not hear what the USCP officer had been saying to Gruppo, as Kelly only stood nearby for part of Gruppo's conversation with the USCP officer.  There is no audio to accompany the USCP surveillance footage, and thus no way to determine with certainty what was said between the officer, Gruppo, and Kelly.



Instead of exiting through the Senate Wing Door, Kelly, Gruppo, and Gruppo's wife chose to continue walking south through the Capitol for approximately four minutes. Kelly spent a total of approximately six minutes inside the Capitol Building. He walked through the Crypt and the Hall of Columns, and ultimately exited through the south door.

Following the riot, Kelly sent several boastful texts to family, in which he expressed pride for having participated in the violent breach and for having "taken back" the Capitol that day. Specifically, Kelly sent the below phtoograph of rioters scaling the walls of the northwest staircase with the following text: "Patriots stormed the White House [*sic*], broke in while Senate (with a little s) was in sessiondenating [*sic*] Arizona. The [*sic*] were hiding under ther [*sic*] desks. Forced into recess. Patriots took back our capital today." Statement of Facts, at 4.





Later that evening, the defendant texted family "All safe. Lot of deception in media."

After his arrest on April 23, 2021, Kelly was immediately cooperative with law enforcement, including by providing law enforcement with passwords to his social media accounts[6] and his consent to search his cell phone.[7]  Kelly also helped to facilitate the self-surrender of the individual designated in his Complaint as "Unknown Male 1," or "UM1," later determined to be Gruppo.  *See* Statement of Facts, at 2, 5-7.  Specifically, it is the government's

---

[6] As Kelly subsequently confirmed during his debrief with law enforcement, he did not use any social media platforms in anticipation of, or in connection with, his participation in the January 6 riot.

[7] Kelly's phone was not searched at that time due to confusion about whether defense counsel's prior insistence that the government obtain a search warrant for the cell phone voided the defendant's consent.  Nevertheless, as described further herein, during a November 2021 debrief with the defendant, the defendant consented anew to a search of his cell phone.

understanding that Kelly encouraged Gruppo to contact an attorney who, in turn, contacted the government to arrange for Gruppo's self-surrender.

*Kenneth Kelly's Interview*

Kelly voluntarily agreed to an interview in November 2021 with the FBI pursuant to the terms of his plea agreement.  During the interview, Kelly accepted responsibility for his actions and stated that he wished he had never gone to Washington, D.C.  He described his decision to enter the Capitol as stupid.

*The Charges and Plea Agreement*

On April 21, 2021, Kelly was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 1.  On April 23, 2021, he was arrested at his home in Florida.  On April 28, 2021, Kelly was charged by Information with the same four offenses.  ECF No. 7.  On September 17, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.  ECF Nos. 22, 23.  By plea agreement, Kelly agreed to pay $500 in restitution upon entry of his guilty plea.  According to the Pretrial Services Report ("PSR"), Kelly has already paid his restitution.  ECF No. 31 (PSR), ¶ 9 n.4.

**III.    Statutory Penalties**

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

12

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  As set forth below, the Section 3553(a) factors weigh in favor of home detention as part of a probationary sentence in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction is the reason he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

In this case, the defendant entered the Capitol after witnessing several rioters scaling the walls of the building.  In fact, the defendant himself had to be hoisted over a wall to join the scores of rioters packed in on the northwest staircase.  The defendant also witnessed law enforcement officers physically clashing with rioters on the Upper West Terrace.  Rather than leave at that moment, the defendant chose to enter the Capitol Building.  While there were no law enforcement officers in the doorway when the defendant entered the Building, there were clear signs of violent

14

entry.  Indeed, as the defendant himself stated in text messages to family, rioters had entered the building "via breaking in windows."  Statement of Facts, at 3.

The defendant's reaction to these acts of violence and destruction is concerning.  Instead of expressing regret or disappointment for having participated in such a violent and destructive assault on the Capitol, the defendant boasted to family members about how he and the other rioters had forced Senators to hide under their desks and go into recess.  The defendant considered his and the other rioters' conduct patriotic, rather than antithetical to the fundamental tenets of our democracy.  He believed that in joining others to threaten the lives of members of Congress and halt the certification of the electoral vote, he had "watered" the "tree of liberty."  *Id.* at 3. Overall, the defendant's statements and conduct on January 6 established the need for a restraint on Kelly's liberty as a consequence for his actions in this matter.

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, Kelly has no criminal history.  PSR ¶¶ 26-27.  He has a medical doctorate degree, and is board certified in Emergency Medicine.  *Id.* ¶¶ 53, 55.  He has active medical licenses in Florida, New Mexico, and Washington.  *Id.* ¶ 55.  The defendant has been employed as an emergency room physician for over 25 years.  *Id.* ¶¶ 23, 59-65.  Since his arrest in the instant case, Kelly has become more involved in several community service projects, including the Mahala Love Project and Doctor's House Call.  *Id.* ¶ 68a.  While Kelly lost his job when he was first charged in this case, he has indicated that he may be re-hired as an emergency room doctor after his case is concluded.  *Id.* ¶ 23.  To date, Kelly remains compliant with his conditions of release.  *Id.* ¶ 12.

The government also notes that from an early point in this case, Kelly, through his attorney, expressed a desire to plead guilty and to assist in the government's investigation of "Unknown

Male 1," later determined to be Gruppo.  When recommending an appropriate sentence, the government gives significant weight to Kelly's prompt resolution of this case and to his assistance in identifying Gruppo.  These factors favor a more lenient sentence.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21, at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  Here, both goals will be served by a sentence of 60 days' home detention as part of a 36-month term of probation.

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 1:21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021, at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 1:21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential

rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's text messages to his family demonstrate the need for some degree of specific deterrence in this case.  Kelly celebrated the violence that occurred on January 6, and he considered his conduct that day—including storming the Capitol and delaying the electoral vote certification—to be "patriotic."  Even after experiencing the chaos at the northwest staircase and witnessing the violent clashes between law enforcement and rioters on the Upper West Terrace, he did not immediately regret his participation in the January 6 riot.   Rather, he believed that in threatening the lives of Senators and forcing a halt to the electoral vote certification, he had "watered" the "tree of liberty."  Kelly knew full well of the violence that had preceded his entry, but that did not deter him from entering the Building or from bragging about the rioters' destructive conduct or for perpetuating the falsehood that the media had been lying about the events that occurred that day.  Overall, Kelly's text messages reflected a troubling mindset that should be specifically deterred through a limited restriction on the defendant's liberty.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[9]  Each offender must be sentenced based on his individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum

---

[9] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[10] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021, at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

---

[10] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who pleaded guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*. *See generally*

*United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *See, e.g.*, *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on Kelly's companion, Gruppo, for reference.  On October 29, 2021, Gruppo was sentenced to 90 days' home detention as part of a 24-month probation sentence.  Though Gruppo's and Kelly's conduct is nearly identical, their personal characteristics are not.  Gruppo is a 28-year Army veteran who swore an oath to support and defend the Constitution.  Additionally, as discussed above, the government gives significant weight to Kelly's prompt resolution of this case and to his assistance in facilitating the self-surrender of Gruppo.  The government's sentencing recommendation of 60 days' home confinement as part of a 36-month term of probation appropriately accounts for the defendant's cooperativeness and early acceptance of responsibility, while ensuring that there is no undue disparity between two similarly situated defendants.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Kenneth Kelly to a two-month term of home detention as part of a 36-month term of probation, and 60 hours of community service.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      _____
HAVA MIRELL
CA Bar No. 311098
Assistant United States Attorney
Detailee
U.S. Attorney's Office
312 N. Spring St., Suite 1100
Los Angeles, CA 90012
Office: 213-894-0717
E-mail: Hava.Mirell@usdoj.gov