# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

        **v.**                    **Case No. 1:21-cr-00331**

**KENNETH KELLY,**

        **Defendant.**

_____/

## DEFENDANT KENNETH KELLY'S SENTENCING MEMORANDUM

COMES NOW the Defendant, **KENNETH KELLY**, by and through his undersigned attorney and respectfully submits this sentencing memorandum in connection with the above-titled matter.  As set forth herein, the Defendant requests this Court to sentence Kenneth Kelly to a term of 6 months on probation. The Defendant has already satisfied his $500.00 restitution obligation.

## I.    INTRODUCTION

1.    The Defendant is a 59-year-old male born in 1963 in Heber Springs, Arkansas.  He has one sister, Robin Kelley-Goss, who resides in North Carolina.  It is interesting to note that his sister is listed as W-2 in the Complaint in this matter. This sister has a daughter which is the Defendant's niece, Isabella, who, again, interesting to note, is W-1 in the Complaint in this matter.

2.      The Defendant received his Bachelor's degree in 1985 from the University of Central Arkansas and his Doctorate degree in Medicine from the University of Arkansas College of Medicine in Little Rock, Arkansas in May 1991.

3.      In December 2004, Dr. Kelly married Jenny Kelly in Las Vegas, Nevada.  As of September 21, 2021, they have been legally separated.  One of the main reasons for the separation and eventual divorce is Dr. Kelly's conduct on January 6, 2021.  The wife, Jenny Kelly, has moved to Hawaii with his children pending the divorce.  Dr. Kelly and his wife have three children, Maris, age 14, Roman, age 12, and Peter, age 8.

4.      As the Court can see from the pre-sentence report, the Defendant has a varied employment record.  While being successful as a physician, he has also always found time to serve the underserved.  He believes in the quality of life over financial gain.  The Court can see between 2016 and 2019 he was employed as an emergency room doctor at the Plains Regional Medical Center earning $650,000.00 a year.  He left this position for a better quality of life with his family and moved to Florida, where he was employed by Advent Hospital in Ocala and Lake Wells, Florida, as an emergency room doctor earning $350,000.00 a year. Because of his conduct in this offense, he was terminated from that employment. Upon his termination, he was left with a longstanding contract to help the Mora County Emergency Medical Services.  His monthly income from that is $920.00.

He basically is the medical director for the Mora County Ambulance Service since January 1, 2013, which is a phenomenally destitute and underserved community, as well.

5.    Once his employment was terminated, the Defendant made nearly a dozen attempts to find employment and was rejected each time due to the pendency of this criminal proceeding. The Defendant has had difficulty procuring malpractice insurance because of these charges.

6.    The Defendant has started and is involved in two projects at this time. One is the Mahala Love Project, with which he has been involved for several years in order to establish clean water, nutritious food, shelter, and healthcare in areas that find it difficult to have these basic functions, and Doctor's House Call, which was launched approximately 3 months ago as a pilot program to provide home-based healthcare.  The Mahala Love Project is currently based in South Africa and they are attempting now to integrate the Doctor's House Call services into that project to not only provide clean water, nutritious food, shelter, and remote healthcare.  A more detailed explanation is provided in Paragraph 68A of the pre-sentence report.

7.    The Defendant has pled guilty to one count of 40 USC § 5104(e)(2)(g):  Parading, demonstrating, or picketing of the Capitol Building.  The co-defendant, Leonard Gruppo, Case No. 21-CR-00391 (BAH), has previously

been sentenced in this jurisdiction.  The Government in its sentencing memorandum in Mr. Gruppo's case asks for a custodial sentence for Mr. Gruppo. (Page 1 Gruppo) Fortunately, the Court in Mr. Gruppo's sentencing did not agree with the Government.   Further, the Government in referring to the defendant's remorse stated "the defendant's remorse did not come when he left the Capitol Building.  It came 4 ½ months later only after Kelly, who at that point had already been arrested and charged, urged him to come forward and turn himself in."  (Page 2 Gruppo). On page 14 of the Government's memorandum in Mr. Gruppo's case, the Government admits, "Instead it took Gruppo 3 weeks (and some convincing from Kelly) before he approached the Government about self-surrendering." (page 14 Gruppo).

8.     The Government concedes that Dr. Kelly arrived at the Capitol Building hours after entry had already been made.

9.     Mr. Gruppo was debriefed by the FBI and the Assistant United States Attorney on October 7, 2021.  He was asked why he entered the Capitol and he stated that prior to entering the Capitol, an unsafe situation, in his opinion, was created.  Law enforcement activity and their actions caused him to find someplace that he felt was safe.  In his opinion, chaos was occurring outside of the Capitol, and peace and calm were inside the Capitol Building.  While inside the Capitol Building, he approached three officers on how to get out. None of the officers Dr.

Kelly encountered ever asked him to leave. One officer stated that the only way

would be the way he came in, but Mr. Gruppo felt that that was not logical or

feasible.  Below is a picture of the Capitol on January 6, 2021 supplied by the

Government.



A second officer further down the hallway told him that he didn't know and

the third officer told him to go out the way that they did – with just seven minutes

elapsing from entry to exit.  Even the Assistant United States Attorney admitted on

the audio that the Capitol was a bit of a maze and she understood.  (Audio of

Gruppo debriefing)

10.     Dr. Kelly also felt the area outside the Capitol Building had become unsafe and chaotic and entered the Capitol Building which appeared more orderly and safe, although unlawful.

## II.     GOVERNMENT SENTENCING MEMORANDUM

11.     The Government notes that on October 29, 2021, Chief Judge Howell sentenced Mr. Gruppo to 90 days home detention as part of a 24-month probationary sentence.  Gruppo was further ordered to pay a $10.00 special assessment following laws and restitution and a $3,000.00 fine.  The Government in this case is recommending 60 days of home detention as part of a 36-month sentence of probation.  (Page 1)

12.     It should be noted that the pre-sentence report recommends that 1 year of probation is sufficient to address the goals of sentencing.  The pre-sentence report goes on to state that "in consideration of the defendant's recent involvement with non-profit organizations, it is not recommended he complete community service hours in lieu of a fine.  It is recommended, however; the defendant comply with mandatory drug testing conditions as a drug test was not conducted during the pre-sentence investigation stage."  The pre-sentence report goes on to state that "it does not appear that he had the ability to pay a fine in this case".  (PSR 19)

13.     The Government in their memorandum repeatedly highlights the text messages of the Defendant.  However, it is obvious that the text messages did not

reflect personal knowledge or participation of the Defendant.  The videos clearly show that the Defendant did not enter the Capitol via breaking in windows.  In fact, the windows were broken well before the Defendant arrived.   The Defendant walked through an open door.  The best timeline the below-named attorney was able to find shows the barricades were breached at 12:57 p.m.  The individual who took the shield and broke a window of the Capitol did so at 2:11 p.m.  President Trump's speech ended at approximately 1:10 p.m. and the Defendant did not enter the Capitol until 3:00 p.m. A diagram in the complaint shows the path of the Defendant through the Capitol.

14.    There is no dispute as to Defendant's path while in the Capitol and the time of 7 minutes that he was in the Capitol.  He did not see anyone hiding under desks nor did he see Congress recess.  These were all things that were being stated over megaphones by various individuals.

15.    The Defendant's remorse is obvious from his statements to law enforcement and to the Court.  The Defendant's lesson has been learned.  His decision to enter the Capitol has cost him his marriage, forced him to sell the family home and live in an RV, deprived him of income for seven months and incur substantial legal fees, the loss of custody of his children, and he is facing the loss of being able to practice his profession.  It should also be noted that the Defendant identified the Capitol Building as the White House.

16.     The Defendant, once he was at the Capitol Building, was eventually pushed by the crowd and law enforcement until escaping to a safe place which appeared to be the Capital Building entrance.  This is verified by Mr. Gruppo. Both of them wanted to go somewhere safe realizing that they were in a dangerous situation outside of the Capital Building.  Again, not an excuse since he was not authorized to enter the Capital.

17.     The Government on Page 3 of the memorandum refers to the fact that the Defendant, along with others, acted in such a way that if they had not acted that way the riot likely would have failed.  The Government on Page 6 deals with such speculation to aggravate Dr. Kelly's situation.  By using such language as "likely would have heard", "he likely would have seen rioters", "he almost certainly would have heard the crowd chanting slogans."  On Page 7 the Government recounts law enforcement pushing rioters and makes the comment that Kelly had other options, he could have gone north in the opposite direction from law enforcement officers. Considering the crowd, this was an unlikely option. More significantly, the path he chose led to prompt exit with no conflict with law enforcement or the proceedings.

18.     The Government details the Defendant's cooperation but has failed to provide him with any meaningful credit. At the beginning of Page 7, the Government speaks of his "immediately cooperating", "immediately cooperated with law enforcement including by providing law enforcement passwords of all

social media accounts and his consent to search his home.  Kelly also helped to

facilitate a self-surrender of individuals designated in the complaints as unknown

white male 1 or UM1 later determined to be Gruppo."  (Page 11)  In November of

2021, Kelly was interviewed by the FBI and accepted responsibility for his actions

"and stated that he wished he had never gone to Washington DC".  He described

the decision to enter the Capitol as "stupid".  (Page 12)

19.   The Government again on Page 13, delves into speculation "As the

entered the Capitol, they would -- at a minimum -- have crossed through numerous

barriers and barricades and heard the throes of a mob.  Depending on the timing

and location of their approach, they also may have observed extensive fighting

with law enforcement and smelled chemical irritants in the air.  No rioter was a

mere tourist that day."  Although no rioter was a tourist, the Government

conveniently fails to focus on the timeline of Defendant's peaceful entry and exit

because that timeline and Dr. Kelly's peaceful actions conflicts with its narrative as

to all defendants it is prosecuting. While true of others, it is not true of Dr. Kelly.

At the time of the Defendant's entry, he was not required to cross any barriers or

barricades, nor did it require the smell of chemical irritants, nor extensive fighting.

(Page 13)

20.   On Page 15 of the Government's memorandum they state the history

and characteristics of the Defendant.  However, it should be noted that Mahala

Love Project was in the works several years before his arrest, and therefore, his involvement preceded his arrest.  Additionally, Dr. Kelly has started and run other non-profits and community outreach projects dating to the mid-'90s. The Government admits to Kelly's cooperation, prompt resolution of the case, and his assistance in identifying Gruppo, these factors favor a more lenient sentence, but its sentence recommendation request is longer probation than that applicable to the defendant whom Dr. Kelly persuaded to come forth.

21.    On Page 22 of the Government's memorandum, they believe that there is no disparity between 90 days on home detention and 24 months of probation versus 60 days home confinement and 36 months of probation.  They believe that they have given the Defendant credit for his cooperativeness and early acceptance of responsibility to ensure that there is no undue disparity between the two similarly situated defendants.  However, we do not see how reducing home confinement by 30 days and increasing probation by a year balances those interests, especially given Dr. Kelly's much greater cooperation. Additionally, Dr. Kelly has been notified by potential employers that any form of detention or house arrest will likely preclude him from returning to Emergency Medicine and other physician employment.

22.    Although Dr. Kelly has repeatedly been refused employment because of these charges, one prospective employer was willing to put it in writing and

stated that even house arrest would "railroad any further efforts to bring you aboard." (Exhibit A)

## III.    SENTENCING FACTORS UNDER 18 USC § 3553(n).

### A.    The nature and circumstances of the offense.

23.    The attack, protest, and demonstration on the U.S. Capitol on January 6, 2021, is the genesis of multiple criminal offenses unparalleled in American history, to that we agree with the Government.  However, like in any large protest that ultimately spawns criminal activity, there were different levels of liability and culpability.  The Government ignores that each defendant should be sentenced based on his individual conduct.  The conduct of Dr. Kelly must fall at the very bottom, the lowest form of culpability. And as such, the wording "sufficient but no greater than necessary" justifies a sentence of probation.  The Government must concede that this defendant never attacked anyone, never damaged any property, never engaged in any chanting, verbal statements, carrying of signs, inciting others, did not sit on or even obstruct, nor did he carry a weapon or defensive gear.

24.    With the crush of people and the chaos that was outside that Capitol door that day, it was impossible for any reasonable man to believe that the safest way to exit the Capitol grounds, was the way they came.  The video shows that the safest way to exit the Capitol is the way the Defendant went, a way of least resistance, lined with police officers and very little chaos or danger.  Dr. Kelly did

11

not support the violence and destruction that has left this dark stain on American democracy.

25.    Dr. Kelly did not confront the police, did not injure any offices, did not enter the House or the Senate floor and did not take any souvenirs, or engage in conduct which has been exhibited by these accounts during the Capitol riot cases.

26.    Dr. Kelly is not affiliated with any organized or extremist groups.

27.    The Government admits on Page 14 that there were no law enforcement officers in the doorway when the Defendant entered the building.

**B.    The history and characteristics of the Defendant.**

28.    The Defendant has provided to the Court, in camera and under seal, approximately 5 minutes of video from inside the Capitol. All the parties agree that the defendant was in the Capitol building for approximately 7 minutes. These videos reflect that the defendant was trying to get through the Capitol and out a door. He did not engage law enforcement, he did not engage anybody. The individual with the defendant, with the large tan coat, was Mr. Gruppo. Attached to this memorandum are video captures from the 5 minutes of CCTV recording. In order for the Court to identify the defendant in the CCTV video, these screen captures are provided as an aid. (Exhibit B)

29.    Attached to this memorandum are letters praising the character of Dr. Kelly. His unselfish desire to help others and to be a productive and contributing

member of society. They speak volumes in support of the person this memorandum portrays. (Exhibit C)

30.     The Government provides the Court with a general background as well as the detail of Dr. Kelly's cooperation in information that he provided which led to the surrender of Mr. Gruppo.  The Government admits that significant consideration should be given to Kelly's prompt resolution of this case and his assistance in identifying Gruppo.  The Government states that these factors favor a more lenient sentence.

**C.     The need for a sentence imposed to reflect the seriousness of the offense and promote respect for the law.**

31.     Before the Court is a Doctor of Medicine who has lost his wife and his children and his material possessions.  He is having difficulty getting employment in his Board Certified profession of Emergency Medicine and obtaining the requisite malpractice insurance to practice his profession anywhere.  His only medical license is under attack in multiple jurisdictions, and he has pending disciplinary actions against him in multiple jurisdictions because of the events of January 6, 2021.  He has a long history of helping the underserved and is doing his best to do good.  A year of probation and a felony conviction to a man who relies on his license and integrity to help others is a severe sentence.  The results of his actions on January 6, 2021, are going to be with him forever and will plague him in

his profession, as well as his personal life.  What has happened to Dr. Kelly

certainly reflects the seriousness of the offense and promotes respect for the law.

>    **D.    The need for the sentence to afford adequate deterrence.**

32.    There is no need to repeat what has been said in **"C"** above.  The

destruction of his life is certainly adequate deterrence.

>    **E.    The need to avoid an unwarranted sentencing disparity.**

33.    A small percentage of the cases thus far have received probation.  It's

hard to imagine a case more deserving of probation than this one – a man who has

just about lost everything.  He can't afford to pay a fine.  He was in the Capitol for

7 minutes and regrets every moment since that day.  Every line from the

Government speaks of a small percentage of cases.

## CONCLUSION

Dr. Kenneth Kelly clearly understands he should not have been in the

Capitol on January 6, 2021.  He clearly understands that there is a consequence to

his actions.  He would never stand for the destruction of property, violence, or

injury to anyone.  His years as an emergency room doctor have taught him to

respect life and protect it.  He has treated multiple law enforcement officers in his

career and would never stand for actions intended to injure a law enforcement

officer. This Court would be setting a dangerous precedent if every trespassing

protestor were to be sentenced based on the actions of the worst of the actors. Dr.

Kelly should be judged for his individual actions and has felt the devastating repercussions of those actions, including the loss of his wife, children, profession, his savings, and his home. Dr. Kelly made over a dozen attempts to find employment, and these 7 minutes of trespass have denied him that ability. A very deep price for a one-time lapse of judgment in a life of compassion and community service. This is especially harsh given that Dr. Kelly has provided the requisite cooperation and remorse relating to his conduct.

We ask the Court today to give Dr. Kelly a chance to rebuild his life.  To try to regain his professional status, to become an emergency room doctor again so he can help others, and to try to repair the damage done to his family and to him from his actions.  The lessons that the Court would want him to learn, he has learned. He will never undertake to conduct himself in such a manner.  He will never allow a mob to affect his actions.  He believes in this country and he believes in the sanctity of law.

The unparalleled protests, disturbances, riots, or attacks which occurred on January 6, 2021, is a serious breach of the peace of American jurisprudence.  It resulted in multiple criminal charges being proposed against multiple individuals.

In the Defendant's presentation to this Court, the Defendant has shown the Court a few minutes of video provided by the Government to the Defendant, to show the Defendant walking through the Capitol.  This video shows the Defendant

walking in wide-open hallways, lined by police officers who did not hinder him.

He walked directly through those corridors and out a door.  He did not protest, nor

did he accost anyone.  He conducted himself peaceably and as a gentleman.

Dr. Kenneth Kelly wishes to thank the Court for its time and consideration.


RESPECTFULLY SUBMITTED,

**TRAGOS, SARTES & TRAGOS, PLLC**

*/s/ George E. Tragos, Esq.*
**GEORGE E. TRAGOS, ESQ.**
District of Columbia Bar No. 429122
Florida Bar No. 184830
E-mail:  george@greeklaw.com