```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                  Plaintiff,          1:21-cr-00331-CKK-1
                                        Friday, January 14, 2022
 5    vs.                               10:00 a.m.

 6    KENNETH KELLY,

 7                  Defendant.
      - - - - - - - - - - - - - - - x
 8

 9    _____

10               TRANSCRIPT OF SENTENCING HEARING
         HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
11                  UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13

14    For the United States:    HAVA ARIN LEVENSON MIRELL, ESQ.
                                U.S. ATTORNEY'S OFFICE
15                              312 N. Spring St., Suite 1200
                                Los Angeles, CA 90012
16                              (213) 894-0717
                                hava.mirell@usdoj.gov
17

18    For the Defendant:        GEORGE TRAGOS, ESQ.
                                TRAGOS SARTES & TRAGOS, PLLC
19                              2363 Gulf to Bay Boulevard
                                Suite 100
20                              Clearwater, FL 33765
                                (727) 441-9030
21                              george@greeklaw.com

22    Court Reporter:           Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
23                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
24                              Washington, DC  20001
                                (202) 354-3187
25
```

```
1                      P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 21-331, The

3      United States vs. Kenneth Kelly.

4              Counsel, would you please identify yourself for

5      the record starting with the government.

6              MS. MIRELL:  Good morning, Your Honor; Hava Mirell

7      on behalf of the United States.

8              THE COURT:  Good morning.

9              MR. TRAGOS:  Good morning, Your Honor; George

10     Tragos on behalf of the defendant.

11             THE COURT:  All right.  And I see Dr. Kelly is

12     here, and we have a probation officer, I assume.

13             THE PROBATION OFFICER:  Good morning, Your Honor;

14     Hana Field with U.S. Probation.

15             THE COURT:  All right.  Let me start.  Dr. Kelly,

16     are you willing to proceed with this on Zoom video?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  So we're here for a

19     sentencing.  The defendant pled guilty to Count 4, parading,

20     demonstrating or picketing in a Capitol Building.  The

21     statutory penalty is the maximum, so six months of

22     incarceration, a maximum $5,000 fine, five years maximum of

23     probation.  He agreed to a $500 restitution.  At the end of

24     the sentencing the government will be dismissing Counts 1

25     through 3.  He is in compliance with his Pretrial Services
```

1      report.

2                I have a presentence report dated November 23,

3      2021, the government's sentencing memorandum, the

4      defendant's sentencing memorandum, three character letters

5      in support of the defendant, and then a Dropbox with various

6      videos.  I think that's all of the information that has been

7      provided to me for the sentencing.

8                Am I correct?  Is there anything else I've missed?

9                MR. TRAGOS:  Your Honor, with regards to the

10     government -- the defendant's sentencing memorandum, there

11     are three exhibits to that as well.

12               THE COURT:  Yes, right.

13               MR. TRAGOS:  Okay, because those are also

14     character letters, one of those exhibits, so I wanted to

15     make sure that it wasn't just three that the Court had.

16               THE COURT:  So the character letters were from

17     Vincent, Mason, and Matsakis, and then there's a series

18     attached to it, a number of photographs and some additional

19     information.  It's not clear to me -- I did look at the

20     attachments.  Apart from the letters, I did look at the

21     attachments, which appear to be emails as far as I can tell.

22               MR. TRAGOS:  A lot of them are in Exhibit C of the

23     memorandum.

24               THE COURT:  Okay.  And it's sort of To Whom It May

25     Concern, but they're related to the sentencing; am I

1    correct?

2               MR. TRAGOS:  Yes, Your Honor.

3               THE COURT:  Okay.

4               All right.  In terms of objections to the

5    presentence report, there was one which related to Paragraph

6    76, which as I -- it's the listing of three vehicles.  There

7    were quite a number of vehicles that were listed.  They

8    relate to vehicles basically registered in New Mexico 1987,

9    1995, and 2012.  The probation officer relied on Accurint

10   records so it's not clear to me -- it would appear that they

11   show registration dates.

12              So he was living in New Mexico at various points.

13   I mean, did he drive vehicles during that time that may have

14   been in his name but belonged to the hospital or something

15   else?  It's unusual to have -- you know, to have it such

16   that they indicate that it's registered to him and then he's

17   objecting to it.

18              MR. TRAGOS:  Your Honor, he has no memory of a

19   2012 BMW.  Again, I don't think it has any consequence to

20   the sentencing, but it's just that he has no memory of ever

21   owning a 2012 BMW or any BMW.

22              THE COURT:  Okay.  The fact that he doesn't have

23   any memory is one thing.  I mean, is he actually indicating

24   that it's not correct?  Did you look at what probation had

25   in their report to support it?

1          I'm trying to figure out how you want it resolved

2     is, I guess, my question.  It doesn't make any -- obviously

3     you want a presentence report to be accurate.  Does it make

4     any difference in sentencing?  No.  But I obviously would

5     like to have it accurate.

6          So they relied on Accurint.  He has no memory, but

7     is it likely to be wrong?

8          MR. TRAGOS:  Your Honor, he just -- I mean, again,

9     he doesn't own a BMW, and he's never owned a BMW.

10         THE COURT:  So the 1987 and the 1995 he's not

11    objecting to.  It's only the 2012.

12         His objection related to the 1987 GMC pick-up,

13    1995 utility vehicle, and then the BMW for 2012.  So the '87

14    and the 1995, is he objecting to that or not?

15         MR. TRAGOS:  No, Your Honor.

16         THE COURT:  Okay.  So no objections to those.  So

17    it's strictly the 2012.

18         And probation, you're relying on the Accurint; am

19    I correct?

20         THE PROBATION OFFICER:  Yes, Your Honor.  We're

21    relying on Accurint records for that.  The vehicle was

22    associated with him by name, date of birth, driver's

23    license, and Social Security number.

24         THE COURT:  Okay.  I'm sorry?

25         MR. TRAGOS:  Your Honor, there's another Ken Kelly

1    in that state who is related to the -- obviously not the

2    same date of birth, but the probation --

3           THE COURT:  Okay.  So what is the date of birth?

4    Do you have the Accurint report?  Does it indicate what date

5    of birth they list?

6           THE PROBATION OFFICER:  Yes, Your Honor, January

7    13, 1963, and it provides a driver's license number that was

8    also associated with Mr. Kelly, the K400-506-63-013-0.

9           THE COURT:  Well, it's got the right birth date.

10           Let me put it this way, Mr. Tragos, how do you

11    want to resolve it?  What are you asking for?

12           MR. TRAGOS:  Your Honor, I think that the Court

13    can -- does the Court, I guess, have to resolve it because

14    it has --

15           THE COURT:  I do because I need to make  factual

16    findings for it.  I mean, we could put that you don't recall

17    the BMW as an extra sentence there or depending on, you

18    know -- I mean, if they have his birth date and it's an

19    accurate one, I would think that it would be associated.

20    Well, I would think from 2012 you'd remember if you had a

21    BMW.

22           Go ahead.  We can't get a record if two people

23    talk at once, and I'll just tell you they'll only record

24    what the judge says so you're going to be missing out.  So I

25    didn't hear what you said.  If you could repeat, Dr. Kelly,

1    what you said.

2              THE DEFENDANT:  Oh, I've never owned a BMW.  I

3    did -- I would have liked to, but I never bought one so I've

4    never owned one.

5              I leased a Jaguar.  I thought that was what that

6    was about.  That was a lease.

7              THE COURT:  So have you leased one?  Would your

8    wife have leased it?

9              THE DEFENDANT:  I leased a Jaguar, but I never

10   owned a BMW.

11             THE COURT:  Okay.  Would your wife have owned it

12   and used your name?

13             THE DEFENDANT:  We've always (inaudible) up until

14   this process; so, no, I don't know how this -- I'm just

15   afraid there are criminal charges for the BMW if I accept

16   it, so I cannot -- it's nothing I've owned.

17             THE COURT:  Probation, would you agree to just

18   simply put that he only objects to the 2012 and just you put

19   a sentence next to it?

20             THE PROBATION OFFICER:  Yes, Your Honor.  We can

21   revise the presentence report to note at the end of that

22   paragraph that he has no memory or does not recall owning

23   the 2012 BMW, if that would suffice with the Court?

24             THE COURT:  Does that work, Mr. Tragos?

25             MR. TRAGOS:  Yes, Your Honor.

1          THE COURT:  Okay.  Well, we'll resolve it that

2     way.  As far as I know, there was nothing else.

3          Let me just indicate, in terms of sentencing, the

4     advisory sentencing guidelines do not apply.  There's no

5     authority to impose supervised release, and as I've

6     indicated, the maximum sentence is six months incarceration,

7     maximum five years probation, the $500 restitution, maximum

8     fine is $5,000, and there is a special assessment of $10.

9          So for the undisputed parts of the presentence

10    report, the findings of fact are under Federal Rule of

11    Criminal Procedure 32(i)(3)(A).  For the one disputed

12    paragraph, findings are pursuant to Rule of Criminal

13    Procedure 32(i)(3)(B).  I'll adopt the presentence report as

14    written except.  We'll do this additional statement relating

15    to -- at the end of Paragraph 76 indicating that the

16    defendant has no recollection of owning the 2012 BMW, and

17    there's no other way really that I can see resolving it at

18    this point.

19          All right.

20          And that will indicate that he's not objecting to

21    the other two, but he is objecting to this one.

22          All right.  And let me, at this point, hear from

23    the government, then defense counsel, and then the

24    defendant.

25          And defense counsel, if you could -- when you

1    speak, if you could move forward a little bit more to make

2    sure.  It's a little blurry in terms of hearing you, but let

3    me hear from the government first.

4              MS. MIRELL:  Good morning, Your Honor.  Thank you.

5              Your Honor, the events of January 6, 2021, have

6    left an indelible stain on the history and reputation of

7    this nation.  Each rioter, including Dr. Kelly, contributed

8    to the global embarrassment that is the January 6th Capitol

9    Riot.  By now this Court is familiar with what occurred just

10   steps away from its courthouse just a little over a year

11   ago, so I will not belabor it.

12             The government's sentencing recommendation today

13   in this case is based on Dr. Kelly's individual conduct.

14   Dr. Kelly drove alone from Florida up to Washington, D.C.,

15   to attend the Stop the Steal rally.

16             The morning of January 6th, Dr. Kelly met up with

17   his good friend, Leonard Gruppo, and Leonard Gruppo's wife

18   and walked to the Ellipse to hear President Trump's speech.

19   After President Trump had concluded delivering his remarks,

20   Dr. Kelly, Mr. Gruppo, and Mr. Gruppo's wife walked from the

21   Ellipse to the Capitol.

22             Upon entering the restricted grounds, Dr. Kelly

23   could see bike racks strewn across the lawn.  Dr. Kelly and

24   Mr. Gruppo stood in the grassy area bordering the northern

25   staircase on the west front of the building.  There you

1    could see rioters scaling the retaining walls of the Capitol

2    Building and climbing the white scaffolding that had been

3    erected over part of the staircase for the inauguration.

4         Instead of departing after witnessing rioters

5    engage in life-threatening behavior, Dr. Kelly instead

6    decided to join the parade and to contribute to the crowd by

7    hoisting himself onto the staircase ledge and by ascending a

8    jam-packed staircase leading up to the Upper West Terrace.

9         There Dr. Kelly witnessed law enforcement

10   violently clashing with rioters.  Instead of departing at

11   that point, Dr. Kelly instead chose to enter the U.S.

12   Capitol Building by walking through an entryway littered

13   with broken glass.

14        The Court has now had an opportunity to review the

15   entirety of the surveillance footage of Mr. Kelly's pathway

16   to the Capitol on January 6th.  As the Court has by now

17   seen, Dr. Kelly and Mr. Gruppo did appear to stop and ask a

18   law enforcement officer near the Senate Wing door how to

19   exit the building.

20        The government submits the law enforcement officer

21   repeatedly pointed Dr. Kelly and Mr. Gruppo to the Senate

22   Wing door, the door through which they had just entered. The

23   government further submits that nothing prevented

24   Dr. Kelly and Mr. Gruppo from exiting that door and leaving

25   the Capitol Building at that moment.  Nevertheless, the

1    government does not dispute that, after speaking with the

2    law enforcement officer, the defendant and Gruppo and

3    Gruppo's wife spent the next five minutes walking straight

4    through the Capitol and did not further engage with any law

5    enforcement officers until their exit.

6         It's clear from the defendant's sentencing

7    memorandum that he now regrets and apologizes for his

8    conduct in light of the professional and personal

9    circumstances he has had to suffer, but in the hours

10   immediately following this violent attack on democracy the

11   defendant was not apologizing or expressing regret for his

12   actions.  Instead, he was boasting to family members about

13   how he and other rioters had forced senators to hide

14   underneath their desks and to go into recess.  He considered

15   his conduct patriotic, and he believed that when he and the

16   others threatened the lives of members of Congress and

17   halted the certification of the electoral vote that he had,

18   quote, watered the tree of liberty.

19        Overall, the defendant's statements and conduct on

20   January 6th establish the need for some type of restraint on

21   Dr. Kelly's liberty to demonstrate the need for specific

22   deterrence in this case.  In sentencing Dr. Kelly, this

23   Court must recognize the significance of the defendant's

24   participation in a violent and destructive challenge to the

25   peaceful transfer of power and really what that means for

1    our democracy.

2         To be clear, the government is not seeking the

3    punishment of Dr. Kelly based on the actions of the worst

4    actors that day, but by being present Dr. Kelly did help

5    create the momentum for the violence that took place.

6    Whether or not he opened his mouth or engaged with any law

7    enforcement officers, the defendant's mere presence

8    validated and affirmed those around.

9         In terms of parity, the case most comparable to

10   Dr. Kelly's is Mr. Gruppo's since the two spent the entire

11   day together and engaged in nearly identical conduct.

12   Mr. Gruppo was sentenced by Chief Judge Howell in October

13   2021 to 90 days home detention as part of a 20-month

14   probationary sentence.  As discussed in the government's

15   sentencing memorandum, there are some mitigating factors

16   with respect to Mr. Kelly, which is why the government is

17   recommending only 60 days home confinement as part of a 36-

18   month probationary term.

19         First, the defendant has been cooperative with law

20   enforcement, including by facilitating the self-surrender of

21   one of his closest friends, Leonard Gruppo.  The defendant

22   has also provided passwords to his social media accounts and

23   consents to search his phone.  Finally, unlike Mr. Gruppo,

24   the defendant did not swear oath to support and defend the

25   Constitution.  He therefore lacks the aggravating factors

1    that were facing Mr. Gruppo.

2              Balancing the factors set forth in Title 18 United

3    States Code Section 3553(a), the government respectfully

4    requests that this Court sentence Dr. Kenneth Kelly to a

5    two-month term of home detention as part of a 36-month term

6    of probation and 60 hours of community service.  Thank you.

7              THE COURT:  All right.  Mr. Tragos.

8              MR. TRAGOS:  Your Honor, in one of the Court's

9    earlier colloquy of what the Court had reviewed, I think the

10   Court reviewed something it did not mention, and that was

11   the four videos that were under seal.

12             THE COURT:  No, I did.  That's the -- I mean,

13   you've attached some things, and that's the Dropbox.

14             MR. TRAGOS:  Okay.

15             THE COURT:  The Dropbox is what I was -- I was

16   trying to describe because you've got photos of things.  The

17   videos themselves I watched through the Dropbox, so that's

18   what I was talking about.

19             MR. TRAGOS:  Okay.  Thank you, Your Honor.

20             THE COURT:  I did see those.

21             MR. TRAGOS:  Okay.

22             Your Honor, many years ago, in an earlier life, I

23   was chief of the criminal division for the United States

24   Attorney's Office in the Middle District of Florida, and as

25   such I had to establish policies to improve consistency.

1    And I understand the need for the government to have

2    consistency, to avoid embarrassment, and to make sure that

3    in a multidefendant-type case they have consistent policies,

4    and they really don't look at the individuals as

5    individuals.

6           And I admit 18 USC 3553 was not something I took

7    into account in a lot of cases when a plea agreement was

8    brought to me for approval, but just recently -- I don't

9    know if the Court ever met Judge Hodges from the Middle

10   District of Florida, but Judge Hodges passed away just a few

11   days ago.  He was chief judge when I was the chief of the

12   criminal division, and we would meet regularly in his office

13   in order to school me on various aspects of criminal

14   procedure and criminal sentencing.  And one of the things he

15   schooled me on was when you sentence a large group -- and

16   admittedly I've never had a group of 750 -- but when you

17   have a large group, you have a group of people who at the

18   top are the most culpable and at the bottom are the least

19   culpable.

20          At the top you have the most culpable, who

21   normally are people who give you a lot of cooperation

22   because they know a lot of the criminal activities.  At the

23   bottom are the least culpable.  They are sometimes because

24   they don't know.  But you can never sentence, he said, the

25   most culpable to the less likely bottom of the triangle.

1   And then when you get to the bottom of the triangle, you

2   still have room if those people do cooperate --

3               (Court reporter interrupts proceedings

4                due to difficulties hearing)

5           MR. TRAGOS:  Was the Court able to hear?

6           THE COURT:  Go ahead.

7           MR. TRAGOS:  Okay.

8           THE COURT:  I would also ask that you not look

9   down because then it makes it harder for us to keep track.

10          MR. TRAGOS:  Okay.  So, Your Honor, just recently

11  we also heard a lot of speeches about what happened on

12  January 6th.  They dealt with the violence, the destruction,

13  and the injury.  And we've also seen a lot of video on

14  media, and there always are videos that are the worst of the

15  worst.

16          None of this was in the mind of Dr. Kelly when he

17  went through the Capitol, and I think when the Court takes a

18  look at the videos -- he wasn't armed.  He didn't have

19  defensive gear.  He didn't attack anyone.  He didn't

20  confront anyone.  He merely walked through the Capitol.

21  Yes, a violation of the laws.  Yes, a violation of that

22  statute.  But that's what he did.

23          And in that seven minutes -- we can take a look at

24  a five full minutes of the seven minutes that the government

25  has provided me and that I provided to the Court, and in

1    that five minutes we can see he was not with masses.  He

2    walked out that door.  He did not attempt to enter the

3    Senate Chamber or House Chamber.  He did not look for the

4    Senate Chamber or House Chamber.  He didn't look for the

5    Vice President.  He didn't look for anybody.  He just calmly

6    walked through with the police officers.  And when he was

7    walking after his initial entry, he was just about by

8    himself, with Mr. Gruppo and a couple of other people.

9           And his entering the Capitol, the pictures, as

10   provided by the government that's in our sentencing

11   memorandum, Your Honor, show us what the packed crowd was

12   like outside that door.  And it was chaos.  Most everybody

13   can admit to that.  The safest place and the safest route

14   was a criminal act, walking into the Capitol, which they

15   did.

16          And when they walked in the Capitol, the video

17   shows they started to go down a hallway.  They didn't know

18   where they were going.  They came back after a police

19   officer.  He pointed out the door.  Although we have a

20   situation in a text message where he talks about the

21   windows, he entered through the door, not through that

22   window.  And when he came back and the officer pointed out

23   that door, the crowd -- there was no safe way to go out that

24   door.  And the reason they came in was because they felt it

25   was unsafe.

1          So they walked down the hallway, talked to two

2     other officers, and finally one pointed down that other

3     hallway where they could exit the Capitol Building.

4          In the complaint the government showed us --

5     because they've gotten the data from his phone -- where he

6     was, and it was a straight line all the way across the

7     Capitol out that door.  He didn't go anywhere else.  He

8     didn't look for anything else.  It was a straight line.

9          So there are 750 defendants.  Somewhere along the

10     line there has to be some people that are deserving of the

11     privilege of probation.  What does it take to deserve that

12     privilege?  I would submit to the Court that no one could do

13     more than Dr. Kelly has done to deserve that privilege.

14          THE COURT:  The government's not arguing for --

15     it's not indicating they're not recommending probation.

16          MR. TRAGOS:  Well, they're recommending probation

17     with house arrest.

18          THE COURT:  Right, which is an ankle bracelet or

19     something else, but it's still probation.

20          MR. TRAGOS:  Right, but it is house arrest.  And

21     that house arrest -- and the reason that we attached those

22     letters is to actually tell you the things other employers

23     were telling us; that they're not going to hire Dr. Kelly

24     because of this incident, and they specifically said that

25     the ankle bracelet would be an issue.

1          And we attached one of those letters as Exhibit A,

2     I believe, to the memorandum in aid of sentencing.  If he's

3     under house arrest, they're not going to hire him.

4          THE COURT:  Well, house arrest -- I guess the

5     question is whether they understand -- whether they think

6     it's sitting at home.  It's not.

7          Basically you're allowed to go to work.  You're

8     allowed to do all sorts of things, but the rest of the time,

9     you know, you're expected to be at home or with an ankle

10    bracelet they know where you are.  I mean, as a practical

11    matter it's not sitting at home.

12         I raise this because a lot of people don't know

13    what house -- house arrest, everybody assumes, for those who

14    are lay people, that you sit at home.  That's obviously not

15    what house arrest it, but go ahead.

16         MR. TRAGOS:  But, Your Honor, I don't think that

17    they thought that because they were willing to hire him, but

18    the fact that he was under that sanction is what caused them

19    the problem.  Plus in the court records he's trying to do

20    these home visits, this home care.  He goes and visits

21    people in their homes all the time.  It just would be a very

22    difficult thing for him to continue his practice of home

23    visits with the ankle bracelet, plus, again, I think his

24    employers would consider that just a killer as opposed to

25    just straight probation.

1        And the government admits this defendant

2    cooperated.  He immediately contacted them through the

3    lawyer saying that he wanted to plead guilty to it.  He

4    certainly has the remorse.  He has certainly suffered.  He

5    is in a divorce because of it.  He's lost his children.  He

6    can only visit them on holidays.  He has lost -- he's living

7    in an RV now.  Even the probation office says that he can't

8    afford to pay a fine.  That's their recommendation.

9        So he has lost everything because of this, and he

10   knows that he has lost everything, and he lost them because

11   he made a decision which he wish he didn't make.  He knows

12   it was wrong.  It was wrong then.  He knows it's wrong now.

13       He has character letters that are attached to talk

14   about his compassion, his ability to help people, the way he

15   helps people, how he cares for those he helps, and it would

16   be a shame to deprive the country of this support,

17   especially doctors that have been in underserved areas,

18   someone like Dr. Kelly.

19       And keep in mind that those character letters are

20   about the humanitarian acts of what he does and how he tries

21   to help people.  He's been trying for years setting up the

22   Mahala Project in South Africa as well as he helps

23   (inaudible) $920 a month so that they can have a doctor who

24   can operate in one of the poorest areas of Mexico.

25       So, Your Honor, he has seen the repercussions of

1    his actions.  He has learned from it, and looking at that

2    video the Court knows nothing probably is a stronger bit of

3    evidence in any trial than when the government puts on a

4    video and the jury actually sees the crime as it's

5    happening.

6         In this case the Court got to see the crime as it

7    was happening, the crimes of the participation of Dr. Kelly.

8    I just don't see any of these defendants be of any lower

9    level in the pyramid of sentencing than Dr. Kelly.  So we

10   ask the Court to please give him probation.

11        Dr. Kelly would also like to speak to the Court.

12        THE COURT:  All right.  Dr. Kelly.

13        THE DEFENDANT:  I present myself humbly before

14   your Court a different man than I was on January the 6th.  I

15   admit that on that date on top of the stairs I panicked and

16   didn't think rationally.  Looking for the safest and fastest

17   way to exit, I realized that the choice through the Capitol

18   was the worst decision of my life.  I never could have

19   imagined what effect on my life those seven minutes cost me

20   as I transited through the building.

21        I greatly regret my error in judgment, and I know

22   it was wrong, and it always will be wrong.  Congress, my

23   country, and my loved ones deserve better from me.  I

24   realize that the country I love was built on the very laws

25   that I breached.  I add to this that I fully cooperated with

1    the government, which included convincing my best friend to

2    surrender himself.  I feel that up to this point I was a

3    very loyal citizen to my country.  I put a lot of energy

4    into contributing to society.

5              I'm sorry for my bad decision that day, and I'm

6    sorry for causing the Court to be faced with such a burden

7    in deciding on how to appropriately discipline me.  I know I

8    leave you with a tough decision.  I truly regret this.

9              Whatever the Court decides, it will actually only

10   be a small part to what I've lost and the pain that I've

11   experienced.  When I say that I stand before you a different

12   man than I was on January the 4th, I do not say -- I mean on

13   the 6th, I do not say this with light consideration.  I will

14   repeat what one of my patients said to me.  Sometimes we

15   must be heated to the highest degree to be purified to do

16   God's work.  I know that committing a crime, pleading

17   guilty, being sentenced, and being labeled a criminal

18   forever along with the loss of my wife, custody of my

19   children, and my finances, my profession, are certainly the

20   firing furnace that purified me for the future.

21             I feel that the purpose of my life is clear thanks

22   to the tribulations that I've created for myself.  I want to

23   love my country, to be a compassionate and caring physician,

24   which has always been my life's purpose, and to honor our

25   country and their laws.  I'm an intelligent doctor who knows

1          the difference.  I blame no one but myself for the decisions

2          I made that day, and I accept full responsibility.  I humbly

3          respect your decision, Your Honor.

4                    THE COURT:  All right.  In part of the information

5          that was indicated -- I realize that you're in a hiatus in

6          terms of your employment.  Are you planning on trying to

7          stay in Florida and, you know, go back to the hospital you

8          were working for?  Are you looking for something else?  Do

9          you have some idea of what your plans are?

10                    THE DEFENDANT:  I have attempted to get a job with

11         13 different emergency room groups, or about that.  I've

12         been blocked on all of those.  The letter that we received

13         said that under no condition would I be employable if I have

14         an arrest.  If probation, they'd allow me in the level that

15         I've worked.  I've worked as director for at least 15 years,

16         and they mean I'm not employable as an ER doctor.

17                    So if I have that -- if that's what is decided,

18         I'll probably try to do some sort of primary care but not as

19         an emergency room board-certified ER doctor because that

20         does not seem to be able.  So it will depend on what you

21         say, ma'am.

22                    MR. TRAGOS:  Right now, Your Honor, he is

23         practicing.  He is doing some home visits in New Mexico.

24                    THE DEFENDANT:  Yes, sir.

25                    THE COURT:  Okay.  So are you in Florida?  I'm

1    also trying to figure that out.  You're living in an RV.  Is

2    that in Florida or someplace else?

3              THE DEFENDANT:  No, ma'am.  I moved it -- I moved

4    it to New Mexico where I was able to get malpractice

5    insurance, but now --

6              THE COURT:  Okay.

7              THE DEFENDANT:  -- New Mexico is coming for my

8    medical license for the insurrection.

9              THE COURT:  Okay.  The reason I ask is that I know

10   probation generally wishes to have the supervision.  They

11   ask for jurisdiction.  I don't transfer jurisdiction.  But

12   the supervision -- and at this point they're thinking it's

13   Florida so obviously it's not.

14             MR. TRAGOS:  It will probably -- depending on I

15   guess the Court's sentence, his office is in -- still in

16   Florida, but New Mexico is the only place he can practice.

17   So he's been going back and forth with his RV.

18             Right now, Your Honor, frankly the RV broke down

19   in -- where?

20             THE DEFENDANT:  Nacogdoches.

21             MR. TRAGOS:  Nacogdoches, Texas.  It broke down on

22   his way here, and it's being repaired in Nacogdoches, so the

23   RV is actually in Texas right now.  He has to go back, pick

24   it up, and take it back.

25             THE COURT:  All right.  I think I would not put in

1    a specific supervision transfer to a particular place since

2    we're not sure where he's going to wind up.

3           So I'm keeping jurisdiction, but I perhaps will

4    plead it -- depending on where he winds up, as the best

5    place to do this, any supervision of him.  I'm going to

6    plead that to a decision that probation makes once he's --

7    you know, once the sentence is done to figure out the best

8    place to do the supervision, whether it's Florida or

9    someplace else, rather than putting in Florida because it

10   may be that that's not the best option.

11          All right.  What I'm going to do is I'm going to

12   take a short break at this point so I can go over what

13   you've talked about and review things, and then I will come

14   back.  I have roughly -- I'll make it 20 to 11:00.  At five

15   to 11:00 I'll come back.

16          I would just stay on the screens.  You can walk

17   off, but don't get off the Zoom because we always have

18   problems getting back on again.  So if you -- you don't have

19   to sit there, if you don't want to, but just leave it on,

20   and I'll be back.

21          (Recess taken)

22          THE COURT:  All right.  I have to say I've been a

23   judge for 37 years or a little over.  Sentencings never get

24   any easier, no matter how long you do them.  So let me

25   proceed.

1        The Court considers the presentence report,

2   pleadings, argument, exhibits, and record in this case in

3   addition to the following information in determining a fair,

4   appropriate, and reasonable sentence in conformance with the

5   factors set out in 18 USC 3553(a) except for (e).

6        The defendant is 59 years old.  There is no

7   criminal history.  A summary of his background in terms of

8   education:  Bachelor of science in 1985 at the University of

9   Central Arkansas; medical degree in '91, University of

10  Arkansas College of Medicine; internships and residencies in

11  internal medicine in Philadelphia at the Thomas Jefferson

12  University Hospital in 1994.  He was board-certified in

13  emergency medicine in 2019.  That will have to be renewed in

14  2023.  He has active medical licenses in Florida, New

15  Mexico, and Washington, the state of Washington.

16        Job history.  This is going to be in summary form

17  since he's been involved at various places, but at the time

18  of his arrest he was employed at the Advent Hospital in

19  Ocala, Florida, and Lake Wales as an emergency room doctor.

20  And this would have been from 2019 to 2021.  Since April

21  21st he's been the emergency room director at Mora County

22  Emergency Medical Services.  He's actually been the director

23  since 2013 but evidently he's become more active this past

24  year.

25        2016 to 2019, emergency room doctors at Plains

1   Regional Medical Center in Clovis, New Mexico.  He was the

2   area director.

3           2020 -- excuse me, 2012 to 2016, emergency room

4   director at Alta Vista Hospital in Las Vegas, Nevada.

5           He self-reports 2011 to 2016 emergency room doctor

6   at Gerald Champion Hospital in Alamagordo, New Mexico.

7   Unfortunately the hospital records don't seem to show the

8   defendant has also been associated with the company Romaris,

9   R-O-M-A-R-I-S, Incorporated.  He's the director and

10  treasurer.  His wife is the president.  It's active in both

11  Florida and Nevada.  I believe that he uses the company for

12  contracts for his medical services so this would be the

13  company for which he's an independent contractor.

14          In terms of nonprofits, he's done quite a bit of

15  work.  Dr. Kelly and his sister founded the Mahala Love

16  Project, healthcare for students for one thing at an

17  orphanage, many of whom have immune deficiency diseases.

18  The other project is Doctor's House Call.  The defendant's

19  sister protocols for cloud-based healthcare systems for

20  remote areas in the United States and elsewhere.

21          In terms of finances, present income is very

22  limited.  He does have assets that could be liquidated, but

23  he's the sole financial provider for his spouse, who is an

24  at-home mother, three children.  He and his wife are in the

25  process of a divorce.  After reviewing his extensive

1    financial records at this point I'll find he has no

2    financial ability to pay a fine.

3            There are no issues with mental health, substance

4    abuse.  He's not been drug-tested so he will -- I will be

5    putting him on probation as one of the conditions.  He will

6    need to take the initial tests, which if they've come out as

7    he's reported that will be the end of it, but we don't have

8    any test results on the record at this point.

9            Physical condition.  Not vaccinated, not tested,

10   but he treated himself for what could be, in his view,

11   symptoms for COVID, and he has described himself as an

12   expert on COVID.  But there's no particular issues that need

13   to be addressed.

14           On a personal basis, he was born into an intact

15   union.  His father's deceased.  His parents divorced when he

16   was 15.  Mother now lives in South Carolina.  He has one

17   sister.  His mother has remarried two times.  The first was

18   to someone who is now deceased.  Her present husband -- the

19   last marriage, the present husband, is still alive.  After

20   his parents divorced, he shared time between his parents in

21   terms of custody.

22           The defendant got married in 2004, separated in

23   September of 2021.  They're in the process of getting

24   divorced.  There are three children ages 13, 11, and 7.  The

25   children and wife are now living in Hawaii.  As I understand

1    it, the wife will have primary physical custody.  Defendant

2    will have supportive custody.  As of yet there is no court

3    order of child support payments.  The children are in

4    school, healthy.  There are no issues.  And I have

5    authorized his traveling to Hawaii in order to be able to

6    see his children.

7          He's resided as an adult in the state of Florida,

8    New Mexico, South Carolina, the state of Washington and

9    Arkansas.  Numerous residents in various states.  I won't go

10   through all of them.  And the last home that he resided in

11   has now been sold.  He owns a recreational vehicle, and

12   evidently that is where he has been living, on campgrounds

13   in Florida.

14         In terms of letters of support, there was, I

15   guess, a number of sets of them.  There were some that were

16   separate and some attached to the memorandum in aid of

17   sentencing.  I'll start with the ones that were separate.

18         A letter from a fellow physician praising his

19   medical skills and concern for family noted that the

20   defendant made house calls, which is a rarity in these days.

21         A letter from his aunt that he was very helpful in

22   providing medical advice for the family and for his

23   grandmother, which would have been the aunt's mother; asked

24   for leniency.

25         One of the defendant's attorneys that has known

 1      the defendant in various capacities has described him as a

 2      dedicated physician caring for patients during COVID in

 3      emergency rooms, made state-of-the-art telemedicine

 4      available to remote areas, went out into the community to

 5      provide care.  His nonprofit work in South Africa with the

 6      orphanage and the immune deficiency children is also the

 7      telemedicine to provide access to care to remote areas or

 8      where medical care is not accessible.  The defendant's

 9      approach is described as, quote, to do the right thing,

10      unquote, and the request is that he not be sentenced such

11      that it will affect his continuing to be able to practice

12      medicine.

13               I must say that in this case he forgot to do the

14      right thing.

15               But in terms of what's attached, there was

16      Exhibit A, which is, as you've indicated, an employer of a

17      potential -- a potential employer, not the one he had been

18      with, which indicates that house arrest would negatively

19      affect his being hired.

20               Exhibit C is nine letters of support.  All attest

21      to the high quality of his medical services, his community

22      outreach and service, and his care for his family.  The

23      letters are from his stepfather, three colleagues, his

24      sister, who talks about the Mahala Love Project, among other

25      things, a patient who has praised the excellent care he

1     received from Dr. Kelly, a letter from his former brother-

2     in-law, from a nurse, and from an insurance company

3     regarding malpractice insurance in New Mexico.

4            In terms of the statement of offense, I have found

5     that instead of trying to summarize it, it works better to

6     frankly just read what he actually agreed to.  So I am going

7     to put this in context so that some of the remarks that I

8     make later make sense.

9            So we're talking about the Capitol located in

10    D.C., which is secured 24 hours a day by the Capitol Police.

11    Their restrictions generally include permanent and temporary

12    security barriers and posts manned by the Capitol Police.

13    Only authorized people with appropriate identification are

14    actually allowed in the Capitol.

15           So this is generally what has been put in place

16    for quite some time.

17           On January 6th, in addition, the exterior plaza of

18    the U.S. Capitol was closed to members of the public, and on

19    that date a joint session of the United States Congress

20    convened at the U.S. Capitol, which is located on First

21    Street in D.C.  During this joint session, elected members

22    of the U.S. House of Representatives and the U.S. Senate

23    were meeting in separate chambers of the U.S. Capitol to

24    certify the vote count of the Electoral College of the 2020

25    Presidential Election which had taken place on November 3,

1  2020.  The joint session began at approximately 1:00 p.m.

2  At around 1:30 the House and Senate adjourned to separate

3  chambers to resolve particular objections.  Vice President

4  Mike Pence was present presiding first in the joint session

5  and then in the Senate Chamber.

6        As the proceedings continued in both the House and

7  Senate, and with Vice President Pence present and presiding

8  over the Senate, a large crowd gathered outside the U.S.

9  Capitol.  As noted, temporary and permanent barricades were

10  in place around the exterior.  Capitol Police were present

11  and attempting to keep the crowd away from the Capitol

12  Building and the proceedings that were underway inside.

13        At approximately 2:00 p.m., certain individuals in

14  the crowd forced their way through, up, and over the

15  barricades and officers of the U.S. Capitol Police, and the

16  crowd advanced to the exterior facade of the building.  The

17  crowd was not lawfully authorized to enter or remain in the

18  building, and prior to entering the building no members of

19  the crowd submitted to security screenings or weapons checks

20  by the Capitol Police or other authorized security

21  officials.

22        The certification proceedings at that point were

23  still underway and the exterior doors and windows of the

24  U.S. Capitol were locked or otherwise secured.  Capitol

25  Police attempted to maintain order and keep the crowd from

1    entering the Capitol.

2              Shortly after 2:00 p.m. individuals in the crowd

3    forced entry into the Capitol, including breaking windows,

4    assaulting members of law enforcement, as others in the

5    crowd encouraged and assisted those acts.  The riot resulted

6    in substantial damage to the U.S. Capitol requiring the

7    expenditure of more than $1.4 million for repairs.

8              At approximately 2:20 members of the U.S. House of

9    Representatives and U.S. Senate, including the president of

10   the Senate, which was Vice President Pence, were instructed

11   to and did evacuate the chambers.  Before that, they had

12   been staying and hiding under desks.  All proceedings of the

13   U.S. Congress, including the joint session, were effectively

14   suspended until shortly after 8:00 p.m. the same day in

15   light of the dangerous circumstances caused by the unlawful

16   entry to the Capitol, including the danger posed by

17   individuals who had entered the Capitol without security

18   screenings or weapons checks.

19             Congressional proceedings could not resume until

20   after every unauthorized occupant had left the Capitol and

21   the building had been confirmed secured.  That didn't occur

22   until 8:00 p.m. when the proceedings resumed.  Vice

23   President Pence remained in the Capitol from the time he was

24   evacuated from the Senate Chamber until the session resumed.

25             Now as to Dr. Kelly.  At approximately 3:00 -- so

1    I've given the other times, so this is after there has been

2    the breach into the Capitol -- the defendant entered the

3    Senate Wing door on the northwest side of the Capitol.  He

4    then walked through the Crypt and eventually exited through

5    the Hall of Columns on the south side of the U.S. Capitol at

6    approximately 3:07.  So it's seven minutes.

7            The defendant texted a family member a photograph

8    from inside the U.S. Capitol with the caption, "Inside White

9    house" -- obviously it was not the White House, but the

10   Capitol -- "via breaking in windows.  Tree of liberty was

11   watered today!"

12           The same day defendant also texted a family member

13   a photograph showing several individuals climbing a

14   retaining wall of the U.S. Capitol with the caption

15   "Patriots storm the White house" -- again, it was the

16   Capitol -- "Broke in while Senate was in session debating

17   Arizona.  They were hiding under their desks, forced into

18   recess.  Patriots took back our Capitol today."

19           Defendant knew at the time he entered the U.S.

20   Capitol Building he didn't have permission to enter the

21   building and, as he's indicated, he paraded, demonstrated,

22   and picketed.

23           So the defendant pled guilty.  He indicated his

24   interest at an early stage and so promptly resolved the

25   case.  He identified the second person who was with him,

1  assisting law enforcement and facilitating the self-

2  surrender of the other individual, his friend, quote, fellow

3  rioter who accompanied him into the Capitol.

4       On arrest, Dr. Kelly was immediately cooperative

5  with law enforcement regarding his social media accounts and

6  cell phone.  During his interview with law enforcement he

7  didn't lie.  He accepted responsibilities for his action in

8  entering the Capitol with the rest of the mob.  He was only

9  in the Capitol for approximately seven minutes.  He entered

10 later in time to the first breach of the Capitol.  He has no

11 criminal history.  He's a respected emergency room doctor

12 and physician in general.  He's been involved for some time

13 in two projects to provide state-of-the-art medical services

14 in South Africa, the Mahala Love Project, and the Doctor's

15 House Call, which provides it to remote areas and to those

16 who are underserved.

17      So I certainly view that as community service, and

18 that appears to be what he's doing now, has done in the

19 past, and presumably will continue to do that.

20      The defendant drove from Florida to D.C. to attend

21 the rally of Former President Trump on January 6, 2021.  He

22 met a former colleague and friend and friend's wife.  He

23 spent some time on the Mall after the speech and then walked

24 to the Capitol.  So he was some time on the Capitol grounds

25 before entering the Capitol.

1          The Capitol grounds were clearly packed with

2    people.  You can see it in all of the things.  So frankly it

3    makes no sense to me that you would go into the Capitol to

4    be safer than staying on the grounds.  Walking up to the

5    Capitol you had to have seen all of these people and how

6    packed they were and, frankly, could have walked away and

7    never got on the grounds and just left.

8          He self-reports that in entering that he had to be

9    pulled up onto the staircase by the rioters because the

10   ledge was too high to climb over to get on the staircase to

11   get into the Capitol, and there were too many people already

12   on the staircase.

13         I must say these do dry out your throat.

14         He agreed he saw bike racks strewn over the

15   grounds, rioters scaling the outside of the Capitol, and he

16   agreed he saw broken windows next to the door that he

17   entered and that the goal of this insurrection was to stop

18   the certification of the Presidential Election and

19   importantly the peaceful transfer of power as guaranteed in

20   the Constitution, which is the bedrock of our democracy.  He

21   was -- he admitted he was unauthorized to enter the Capitol

22   and was clearly aware from his texts what was going on at

23   the Capitol and his interest in interrupting it.

24         As I said, after the attack on the Capitol he sent

25   these texts to his family expressing pride in his role as

1   part of the riot insurrection.  He boasted that he and

2   others entered the building -- although he called it the

3   White House -- via breaking windows while the Senate was

4   debating Arizona's electoral vote count.  He lauded the fact

5   that he was part of the insurrection that caused senators

6   to, quote, hide under the desks and forced Congress into

7   recess so that they were not able to proceed with the

8   electoral process.  He described and celebrated the obvious

9   destruction and violent acts of his fellow insurrectionists

10  texting inside via breaking windows.  And you can see he --

11  there certainly have been enough videos that indicate the

12  breaking windows, how it was done, glass all over the place.

13  "Inside via breaking windows.  Tree of liberty was watered

14  today!"  He described his actions as, quote, patriotic,

15  unquote.

16          He gets credit for pleading guilty and

17  acknowledging that he was unauthorized to be in the Capitol

18  while the certification of electoral votes were counted.

19  His commentary, however, gives me pause.  His texts reflect

20  his mindset and intent on that day.

21          Has Dr. Kelly learned his lesson for the future?

22  Does he fully appreciate the significance of having

23  participated in an insurrection, albeit for only seven

24  minutes, but clearly to disrupt the peaceful transfer of

25  power by stopping the certification of the Presidential

1   Election, which he clearly knew he was doing?

2          His regret now of having been involved in light of

3   the consequences to him -- which are severe, there's no

4   question of that.  He's lost his job.  His medical licenses

5   are in jeopardy as well as his malpractice insurance.  It's

6   resulted in the dissolution of his marriage.  He's now

7   living in an RV.  He's separated from his children.  He's

8   not in the same position he was.  And so the question is,

9   you know, the negative effects and consequences is not the

10   same as appreciating the significance of what he

11   participated in.

12          If you engage in criminal conduct, there are

13   always consequences, and here -- his have certainly been

14   negative and very personal to him in terms of himself, his

15   family, and his profession, but I guess -- you know, I don't

16   see them as the same thing as appreciating the significance

17   of what he did.

18          And also, has he considered the consequences to

19   himself, but to the hundred -- approximately 140 law

20   enforcement officers that were injured, some very seriously?

21   And I would say he didn't involve himself in any of that,

22   but this is sort of like the getaway driver of a bank

23   robbery.  He's sitting outside.  His compatriots go in.

24   They have a gun in order to get the money, and somebody

25   shoots him, and the getaway driver is going to have some

1    responsibility for the others' actions.

2           So I can't totally separate it.  I certainly give

3    him credit that he didn't damage or engage in any violence.

4           Now, I would point out that the only other time

5    the Capitol's been invaded was when the British, in 1814,

6    invaded it.  Besides the Civil War, which is certainly not a

7    small matter, there have been difficult times and divisions

8    in our country based on political divisions, racial

9    violence, presidential assassinations, unpopular wars and

10   economic woes.  In spite of those difficult times, there

11   have been peaceful transfers of power during that period of

12   time.

13          His explanation that he wasn't stopped, didn't

14   damage anything, and did not engage in fighting law

15   enforcement, I certainly give him credit, but it doesn't, in

16   my view, lesson his guilt.  It just appears to support a

17   lack of acceptance of the import of his actions on that day.

18   But he does get credit for not damaging property, not being

19   violent, because he didn't engage in any of that, but his

20   presence did help sustain the momentum of the other

21   insurrectionists who engaged in violence.

22          The videos that were provided shows a lot of

23   people milling around, but the point of it is that by

24   participating he encouraged the others.  Having a large

25   number of people, which he could certainly see from outside

1    and while he was trying to get in, including the defendant,

2    participating in this insurrection provided safety for those

3    that engaged in the violent actions of others.  So it

4    provided safety.  He didn't need to do it, but he's there,

5    and his presence does help.

6         The violence of January 6th is an unacceptable way

7    to resolve political differences.  There are lawful means

8    available in the democracy to change or challenge actions

9    you disagree with which don't include violent insurrection.

10   Your presence and actions by joining other insurrectionists

11   was an inexcusable attack on our democracy and the peaceful

12   transfer of power according to the Constitution and a

13   disrespect for the rule of law which governs civilized

14   societies.  As an educated man, you should have appreciated

15   that.

16        You should also appreciate what an extraordinary

17   country you live in with a vibrant democracy.  And I hope

18   you teach your children how lucky they are to live in this

19   democracy as opposed to some other country ruled by an

20   authoritarian.  It's my hope that my sentence sends a

21   message to you, to deter you into considering going forward

22   and others -- and that's important -- from ever engaging in

23   this type of disruptive behavior in the future recognizing

24   you live in a country with incomparable freedoms which are

25   protected by the rule of law.  Eliminate the rule of law,

1    and you jeopardize those freedoms.

2          Now, I do want to go back and talk a little bit

3    about parity, which are in another part of my notes, if I

4    can get them back here.  I want to talk also about the

5    videos briefly.

6          The videos that have been provided do show the

7    insurrectionists milling around.  Law enforcement's present.

8    There's no fighting.  There's no violence.  There's no

9    damage being done certainly during the period that evidently

10   or at least what's captured when Dr. Kelly was there.  Most

11   of it would have been done presumably at an earlier point.

12   But certainly in coming -- walking down from the Mall and

13   the speech, you could not have missed the crowd of people

14   and what they were doing even though it was later.  You can

15   see from the photo, in terms of the people getting up

16   outside on the scaffolding, some, you know, engagement

17   between law enforcement.  Although he wasn't doing it, and

18   it wasn't in the Capitol, he certainly was involved.

19          In terms of parity, parity in these cases, which

20   is what I'm looking at in terms of the January 6th

21   defendants -- ordinarily we would look at parity across

22   criminal sentences, but I don't think that works for these

23   January 6th cases.  I think misdemeanants involved in other

24   crimes probably wouldn't get these sentences.  These

25   sentences are more lenient, to be frank, than in many -- not

1    all, but in many instances, if you looked at misdemeanants

2    across the board.

3          So I'm not looking at it that way.  I don't think

4    that's a good way to do it.  I don't think it's fair to the

5    January 6th group of defendants to compare them to other

6    misdemeanants.

7          So I'm doing what I think all other judges are,

8    which is we all have -- the government has put together a

9    list of defendants, the charges in terms of the statutes,

10   what the government has recommended, and what the Court has

11   done.  The Court itself has also done one that sets out and

12   has a little more detail in which we have shared with all of

13   us -- and each of us individually have cases and we have

14   also -- I've done my own, and I've also indicated trying to

15   make distinctions in terms of what people have done and why

16   so that I'm fair to the group of people that come here.

17         I don't want to be an outlier at one end or the

18   other.  I want to have parity and be fair to those that were

19   involved in these January 6th cases.

20         So I've done my own sort of view of the continuum

21   in terms of what's involved in providing -- in sentencing

22   particular defendants.  So I've done individual sentences

23   taking a look at specific things to make sure that I'm fair

24   to the individuals, but also doing it in context of the

25   broader group of defendants that have been sentenced as well

1    as my own sentences.

2            So in terms of what the government -- I'll deal

3    with what the government starts with.

4            I think I will not do community service.  I

5    frankly think he's already doing it, and I think he'll

6    continue to do it.  I see no reason to require some

7    additional time.  He's obviously going to have to spend some

8    time and some focus on getting himself employed so he can

9    support himself, but probably more importantly his children

10   and his wife.  But most specifically his children.

11           I will put him on probation.  I will not do --

12   I've debated back and forth about the length of the

13   probation.  I think based on what I see as remorse -- I'm

14   still a little concerned about his -- based on his texts as

15   to what his understanding of the seriousness of his

16   participation was as opposed to just that it's had dire

17   consequences for him, which I can understand, and that may

18   be enough.  It may certainly serve as a deterrence, but I'd

19   also like to feel more comfort in feeling that he really

20   understands this was not the way to challenge an election.

21   You don't do it this way.  You don't try and overturn the

22   government.

23           So his comments are what have given me --

24   particularly since some of them were after the fact so it

25   would have been -- I would have hoped he'd have given some

1    thought at that point to what he had actually been engaged

2    in and what the effect had been.  I think he clearly was

3    happy that the process was stopped, that the -- their

4    insurrection cowed senators who were hiding under desks.

5    Those comments give me great pause, and so I will do --

6    understanding this may create problems for his employment,

7    at least for an initial period, but I think those comments

8    merit some home detention.

9            So in terms of the sentence, pursuant to the

10   Sentencing Reform Act of 1984 and in consideration of the

11   provisions of 18 USC 3553 it's the judgment of the Court

12   that you, Kenneth Kelly, are hereby sentenced to a term of

13   12 months -- one year -- of probation on Count 4 and to

14   serve 60 days of home detention while on probation.  The

15   location monitoring -- you'll be monitored in the form of

16   location monitoring technology for a period of 60 days.  You

17   must follow the rules and regulations of the location

18   monitoring program.  The cost of the program is waived.

19           Location monitoring technology will be at the

20   discretion of the probation office.  It can include

21   radiofrequency monitoring, GPS monitoring, SmartLink or

22   voice recognition.  This form of location monitoring

23   technology will be used to monitor the following

24   restrictions on your movement in the community.

25           You're restricted to your residence, wherever that

1    is, at all times except for employment, education, religious

2    services, medical -- should there be need for substance

3    abuse; unlikely, but we'll see the drug test -- any mental

4    health treatment -- although I don't think that's probably

5    necessary -- attorney visits, court appearances, and court-

6    ordered obligations.  And the probation office can

7    preapprove other activities that are appropriate in terms of

8    your going about your life and your employment.

9            The Court authorizes supervision of this case to

10   be transferred to the district where they will be

11   supervising him.  I will not put something in there at this

12   point, since it's unclear to me, and what you need to do is

13   to talk to our probation here to work out where is the best

14   place to be supervised.

15           I am not shifting jurisdiction.  Jurisdiction will

16   remain in this court.

17           The Court finds you don't have the ability to pay

18   a fine and, therefore, waives imposition of a fine in this

19   case.  You do have to pay a special assessment of $10, which

20   I can't waive.  It's required by the statute.

21           The financial obligations are immediately payable

22   to the -- let me see -- payable to the Clerk of the Court

23   for the District of Columbia, and you will be paying

24   restitution in the amount of $500.  That can be paid -- do

25   you plan on paying all together, or are you asking for

1    something that is done over time?

2         MS. MIRELL:  Your Honor, I believe restitution has

3    already been paid in this case.

4         THE COURT:  Have you paid it?  Okay.  Let me

5    indicate, then, that restitution has been paid.  I will --

6    it should be listed as there was restitution that was

7    required and that he's paid it so it's clear that the

8    condition that he agreed to in the plea agreement has been

9    satisfied and that it actually was considered.

10         Probation will release the presentence

11   investigation report to all appropriate agencies -- which is

12   the U.S. Probation Office -- in whatever the approved

13   supervision in order to execute the sentence, and the

14   treatment agencies will return the presentence report to the

15   probation office upon completion or termination from

16   treatment.

17         In terms of the notice of appeal, pursuant to 18

18   USC 3742, you have a right to appeal the sentence imposed by

19   the Court.  The only condition that is left is if

20   imprisonment is longer than the statutory maximum, which

21   it's not.  There is also one other exclusion, but that would

22   be relating to ineffective assistance of counsel.  Your

23   notice of appeal is pretty narrow, but you should talk to

24   counsel, if you wish to appeal; and if you choose to do so,

25   you have to file it within 14 days of the Court entering

1    judgment.  If you can't afford to file it, the Court can

2    grant you leave to file without your having to pay the

3    costs, and you also can ask for appointed counsel should you

4    need appointed counsel and not be able to afford it.

5             As defined in 28 USC 2255, you also have the right

6    to challenge the conviction entered or sentence imposed if

7    new and currently unavailable information becomes available

8    or on a claim that you received ineffective assistance of

9    counsel.  Again, if you cannot afford it or you need counsel

10   appointed, you can do so with a request to the Court.

11            In terms of -- I would have you talk to probation.

12   They're on -- you can either talk now or later as to how you

13   want to go about this in terms of making some decisions.

14   I'll give you a period of time in terms of -- that the

15   probation supervision does not have to begin until February

16   4th; so that gives you enough time to figure out where you

17   want to live.  They can work with you about where you're

18   going to be supervised.  So the probation and the home

19   detention would start at that point, which would give you a

20   couple of weeks to figure out where you're going to be and

21   work with probation about where you're going to be

22   supervised since it doesn't -- it's not clear it's going to

23   be, you know, Florida.

24            Pursuant to D.C. Circuit opinion, which is the

25   *Hunter* opinion decided back in 2016, are there any other

1    objections to the sentence that we haven't already

2    discussed?  If there's something else, this is the time to

3    bring it up.

4         So let me ask probation first.  Is there anything

5    that -- in terms of the sentencing form or anything else

6    that I need to bring up?  It's a year probation with the 60

7    days of home detention, and he's already paid the

8    restitution so he basically has the $10 to pay.  Anything

9    else that I need to address?

10        THE PROBATION OFFICER:  I just want to clarify.

11   Probation doesn't start until February 4, 2022; is that

12   correct?

13        THE COURT:  Yes, I'm sorry, I should have put the

14   year in.  Yes, 2022.

15        THE PROBATION OFFICER:  Okay.  Thank you, Your

16   Honor.  The only other thing I would ask is that the Court

17   ask Dr. Kelly to make himself available by telephone so that

18   I can go over the conditions of probation and get some more

19   information about where he's living so that I can -- we can

20   figure out where he can be supervised.

21        THE COURT:  Okay.  And I would add -- I will put

22   in as part of the sentencing format the mandatory conditions

23   as well as the standard conditions will be -- there are

24   basic expectations, and you should just be aware that the

25   mandatory conditions include not committing another federal,

1    state, or local crime; not unlawfully possessing a

2    controlled substance.  You must refrain from any unlawful

3    use of a controlled substance.  You must submit to one drug

4    test within 15 days of placement on supervision and at least

5    two periodic drug tests thereafter.

6            I will leave that to the probation office.  They

7    have a protocol as to, depending on if your tests come back

8    negative, how often or lack thereof you need to do drug

9    tests.  I'm not exempting him from -- because frankly we

10   don't have any drug tests so it's only self-reporting that

11   there isn't any problem.  But if they come back negative,

12   then this will not be a continued condition.

13           So anything else?

14           But I would -- Dr. Kelly, you should call her to

15   talk over the supervision.  I've gone over the mandatory,

16   but there may be other things; and also to discuss with

17   her -- which may be an ongoing discussion -- about where

18   you're going to be, where they're going to supervise you,

19   which also relates to the kind of location monitoring they

20   do.  So different places have different ways of doing it so

21   you may wish to engage in a discussion with them relating to

22   that, but I'll give you the time until February 4th of this

23   year to work all of that out.

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Government, anything from you?

```
 1              MS. MIRELL:  No, Your Honor.

 2              THE COURT:  Okay.  And Mr. Tragos, anything from

 3      you?

 4              MR. TRAGOS:  Yes, Your Honor, I just want to clear

 5      something up with the drug testing.  He's going to do an

 6      initial drug test.  If that initial drug test is negative, I

 7      thought the Court indicated that there wouldn't be a need

 8      for --

 9              THE COURT:  They do it within 15 days of placement

10      on supervision, is the usual.  At least that's my

11      understanding, and the probation officer can correct me.

12      Generally they do one 15 days on supervision, and then there

13      may be periodic drug tests, two periodic afterwards.

14              Probation has their own protocol so instead of my

15      deciding it, they have a protocol, which I would adopt,

16      which indicates if the test comes back negative how many

17      times you need to test or don't need to test.  If it comes

18      positive, then they have another protocol.

19              I'm correct, Probation Officer; am I?

20              THE PROBATION OFFICER:  That's correct, Your

21      Honor.

22              THE COURT:  Okay.  So there will be a first one,

23      and then depending on what comes back it will -- the

24      protocol will kick in.

25              MR. TRAGOS:  I'm just going -- because he has a
```

1   DEA license and therefore -- he has a DEA license so

2   therefore it has to come back negative.  That's why I was

3   saying I don't know why they want the initial one, but I

4   understand the Court is letting them do their protocol.

5           THE COURT:  Part of the -- since we didn't have

6   anything on our records about his tests, it's appropriate to

7   be -- as a standard condition to have the test, and then,

8   you know, if it comes back negative, and if there's other

9   ways that are being tested there's no reason to duplicate --

10  a duplication.  So if he's doing it as part of his medical

11  license or some other way of doing it, probation may very

12  well feel that that's enough.  We'll leave it to them.

13          Usually you don't -- there's no need to duplicate,

14  you know, testing.  But I -- that's something that they're

15  going to have to work out.

16          Usually they have language about -- determined by

17  the Court.  I don't think -- my point is he doesn't have to

18  come back to me or probation to me.  I want them to use

19  their own protocol after the first test, okay?  So I'm

20  giving them discretion to use their protocol.

21          MR. TRAGOS:  All right.  Your Honor, the other is

22  house calls, as we've mentioned during the course of this

23  sentencing, is a situation where he actually goes to the

24  home and treats patients.  It has been, at least in some

25  jurisdictions, when someone's put on probation or house

1   arrest, particularly the initial probation, they normally

2   are strict about that.  So we would ask that if the Court

3   would tell them that he can continue to do house calls

4   during probation and during house arrest.

5            THE COURT:  Okay.  Generally -- I'll hear from

6   probation about this.  Generally, for additional things

7   besides what I've already put in, which is part of the

8   judgment, we leave it to probation because they will check

9   as to what house calls you're making and if they decide that

10  you're going to be doing it.  In other words, I'm not going

11  to approve it without knowing he's going to do them and

12  what's involved with it.

13           Probation will talk to him about his house calls;

14  and if they're doing it, they may very well go ahead and

15  approve it.

16           MR. TRAGOS:  I just -- I guess I can inquire of

17  probation if they have a situation where they do have a 60-

18  day restriction or can they start this right away?  Or do we

19  need a court order, I guess is what I'm asking?

20           THE COURT:  I guess, Ms. Field, I don't know

21  whether it's done by different probation officers or there's

22  a uniform one across the board.  Do you want to address the

23  issue of house calls?

24           My assumption is the house calls -- that they

25  would want to check that there actually are house calls in

1      terms of your going.  They're not going to, you know -- in

2      terms of being able to do it, I don't know whether they'd

3      approve it or not.

4              Ms. Field, do you want to address it?

5              THE PROBATION OFFICER:  It sounds to me, Your

6      Honor, that house calls are part of his employment, if I'm

7      correct.  So in that case he would submit a schedule --

8      traditionally in D.C. he would submit the schedule a week

9      prior to whatever employment obligations, but where and when

10     he would need to be, and those are approved by the probation

11     officer.  So it sounds like these house calls are a part of

12     his employment that are permitted.  Probation will go over

13     the employment obligations by his supervising officer.

14             MR. TRAGOS:  Your Honor, the house calls situation

15     is where he can get called and have to leave immediately.

16             THE COURT:  Well, he may need to call and let

17     them know that that's what he's doing.  I mean, I have to

18     say to you home detention/location monitoring has

19     restrictions.  That's what it is.  So they will make an

20     effort, if it's part of his employment, to do it, and they

21     may have procedures for -- he's, I'm sure, not the first

22     doctor that's under home detention.  They will have

23     procedures for if an emergency arises, which can be true of

24     other professions as well.

25             But I'm not going to get into the fine details

1    because frankly it needs to be done by the office who is

2    actually going to supervise him as to -- and where he is as

3    to doing it.  If he's got a regular schedule of things, then

4    provide it.  They'll approve it, and he goes, and he doesn't

5    need to do any other additional ones.  If an emergency comes

6    up, he'll have to talk to them about what their procedures

7    are if you get an emergency call that you view as an

8    emergency in terms of going there.

9              MR. TRAGOS:  I think the Court did say travel to

10   Hawaii.  The Court's approving Hawaii travel to see his

11   family.

12             THE COURT:  In terms of travel, my recollection in

13   probation is -- and Ms. Field can change this -- that

14   generally speaking they have some limitations to start with,

15   but I do believe that with visits to family -- but I will

16   defer to her as to whether it's -- the procedure, the

17   general procedure in probation and home detention.  If

18   you're doing it during home detention, you're going to have

19   to get approval from the probation office in terms of

20   supervising you as to whether they'll let you do that.

21             But in terms of the probationary term itself, the

22   year, what is -- what do they usually do if it's going to be

23   outside of the area where he's supervised, Ms. Field?

24             THE PROBATION OFFICER:  Your Honor, he's permitted

25   to travel to Hawaii.  Requests will need to be submitted

1    prior to his intent-to-travel date.

2         These are all things I can go over with defense

3    counsel once we go over the conditions after the sentencing

4    hearing.  Travel to Hawaii is permitted, but requests need

5    to be provided to the probation prior though.

6         THE COURT:  Okay.  So generally what it is is that

7    you set out whatever your travel is, and they -- you let

8    them know.  They approve it.  They know they're going to be,

9    you know -- going to be out of wherever it is that you're

10   living, and they approve it unless there's some issue.

11        If you're in compliance, there's not going to be a

12   problem.  If you're not in compliance with your conditions,

13   then they're not going to let you travel, to be frank, but

14   what you do is you work it out with probation in terms of

15   their letting you.

16        Generally speaking, if you're in compliance, there

17   shouldn't be a problem of your being able to -- you're still

18   within what's considered the United States.  You're not

19   traveling internationally.  So it should be something that

20   is worked out, but that's something you need to talk to them

21   about.

22        MR. TRAGOS:  And for the phone call, can we do

23   this initial conversation right after the sentencing?

24        THE PROBATION OFFICER:  Yes, my request is to do

25   it right after the sentencing hearing.

1          THE COURT:  Okay.  What I can do -- let me finish

2    things, and what I can do is leave you on Zoom.  You know,

3    our deputy courtroom clerk needs to be the host and around,

4    but she's not going to be paying any attention to this.

5    We'll get off and you and probation, while the three of you

6    are there, can have a discussion.

7          Ms. Field, are you prepared, or do you need other

8    material to have a discussion with him?

9          THE PROBATION OFFICER:  No, I'm prepared to have a

10   discussion.  Thank you.

11         THE COURT:  Okay.  So once we're done, I'll get

12   off, the government will leave, and you can talk so that

13   you -- instead of doing a phone call, you'll actually be

14   able to eyeball each other.

15         So let me make sure that I've done what I need to

16   do in terms of the sentencing.  And let me just say if

17   there's some additional issues once they have spoken, you

18   can come back -- I'm keeping jurisdiction so you can come

19   back to me to ask, if things are not worked out with

20   probation or there's some question.

21         But you're getting into the minutiae, and that

22   really is something that probation -- they have regular

23   procedures uniformly that they do across the board.

24   Obviously home detention is going to have some more

25   limitations than just the rest of the period of time on

1    probation.

2              So let me just look through and make sure I've

3    covered everything.

4              All right.  I think I have.  I don't think there's

5    anything else, Ms. Field, that I need to cover for the

6    sentencing; am I correct?

7              THE PROBATION OFFICER:  That's correct, Your

8    Honor.  Thank you.

9              THE COURT:  All right.  Dr. Kelly, I certainly

10   don't expect to see you back here.  I'm not switching

11   jurisdiction; so if something comes up and you violate it,

12   you'll be back in front of me.  You're going to disappoint

13   me to no end.  I've given you, you know, a shorter period of

14   probation.

15             Hopefully you will be able to get your employment,

16   since you need to support your family, but I also want you

17   to give very careful thought about what I said to you about

18   the significance of what you got involved in and how, you

19   know, the attack on the democracy is not something to be

20   lightly taken, and I would hope that you would not

21   participate in the future in.  I still have some pause,

22   which is why you're on home detention.  If I didn't have a

23   pause, I wouldn't have done that, but I think your texts

24   give me some pause.

25             And I hope that is you -- if you talk to your

1    children, at least the two older ones, that you -- if you're

2    going to explain what you did, that you explain that this is

3    not the way to deal with a democracy in terms of overturning

4    it.  But also, you should explain that when people make

5    mistakes, they own up to it, they get the consequences, they

6    get their punishment, and then they move on with their life,

7    which is what I would expect you to do.

8              THE DEFENDANT:  I have done that, Your Honor.

9              THE COURT:  All right.  The parties are

10   excused other than we'll leave Ms. Field and Mr. Tragos and

11   Dr. Kelly, and take care.  Be safe.

12             THE DEFENDANT:  Thank you, Your Honor.

13             THE COURT:  Do you have some sense of how long

14   this is going to be because Dorothy needs to head out as the

15   host?

16             THE PROBATION OFFICER:  Ten minutes at the most,

17   if that's okay.

18             THE COURT:  Okay.  That's fine.  She can do other

19   work at the desk.

20                  (Whereupon the hearing was

21                   concluded at 11:47 a.m.)

22

23

24

25

1     <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3     I, LISA A. MOREIRA, RDR, CRR, do hereby

4 certify that the above and foregoing constitutes a true and

5 accurate transcript of my stenographic notes and is a full,

6 true and complete transcript of the proceedings to the best

7 of my ability.

8   **NOTE:**  This hearing was held remotely by Zoom or some

9 other virtual platform and is subject to the technological

10 limitations of court reporting remotely.

11     Dated this 8th day of February, 2022.

12

13

14      <u>/s/Lisa A. Moreira, RDR, CRR</u>
       Official Court Reporter

15       United States Courthouse
       Room 6718

16       333 Constitution Avenue, NW
       Washington, DC 20001

17

18

19

20

21

22

23

24

25